Argued and submitted October 20, 2008, affirmed May 20, 2009

MOUNTAIN HIGH HOMEOWNERS ASSOCIATION,
an Oregon non-profit corporation,
*Plaintiff-Respondent,*

*v.*

J. L. WARD CO.,
an Oregon corporation;
J. L. WARD CONSTRUCTION CO., INC.,
an Oregon corporation,
*Defendants-Appellants.*

Deschutes County Circuit Court
03CV0451AB; A133744

209 P3d 347

425-a

Brad S. Daniels argued the cause for appellants. With him on the briefs were Gregory R. Mowe, James N. Westwood, and Stoel Rives LLP.

Richard S. Yugler argued the cause for respondent. With him on the brief were Lisa T. Hunt, and Landye Bennett Blumstein LLP.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Haselton, Judge.

WOLLHEIM, P. J.

## WOLLHEIM, P. J.

Plaintiff, Mountain High Homeowners Association, is the homeowners association of a residential planned urban community and subdivision in Deschutes County.[1] Defendants, J. L. Ward Co. and J. L. Ward Construction Co., Inc., are the developers of Mountain High and the owners of Mountain High Golf Course,[2] which is adjacent to, but not a part of, Mountain High. A dispute concerning the continued operation of the golf course is the subject of this action.

Plaintiff brought this action against defendant. Plaintiff's amended complaint sought, in part, to quiet title in an equitable servitude to the golf course property, to reform a restrictive covenant to include a larger section of real property, a declaration that an equitable servitude existed restricting use of the golf course property, and a permanent injunction requiring restoration of the golf course. The trial court declared a negative equitable servitude by estoppel burdening certain real property and entered a permanent injunction against defendant to prevent and remedy waste on the property.

On appeal, defendant makes four assignments of error. It contends that the trial court erred in (1) concluding that plaintiff had standing under ORS 94.630 to bring this action; (2) declaring the existence of a negative equitable servitude by estoppel benefitting the individual lots in Mountain High; (3) holding that plaintiff could pursue a claim for waste; and (4) entering a permanent injunction to prevent waste, requiring restoration, maintenance, and operation of the burdened property as a golf course for 15 years. For the reasons that follow, we affirm the judgment of the trial court.

### FACTS

We find the following facts on *de novo* review. *See* ORS 19.415(3). Defendant, as part of its business of developing residential subdivisions, developed the Mountain High

---

[1] The planned community of Mountain High consists of four subdivisions: Alpine Village I, Alpine Village II, Aspen Village, and Willow Creek Village. We use "Mountain High" to refer collectively to all of the four subdivisions.

[2] J. L. Ward Co. and J. L. Ward Construction Co., Inc., are referred to collectively as defendant.

planned community. The company planned the subdivisions within Mountain High and sold home/lot packages within the community. Although defendant acquired the land that makes up Mountain High over a period of time beginning in the 1970s, it did not begin selling property and constructing homes until 1984. As part of its marketing of the properties, defendant planned to build a golf course within Mountain High. Jan Ward (Mr. Ward), the controlling shareholder and president of defendant, testified that the initial plan included a nine-hole golf course and that construction of that golf course began in 1984. Several years later, a decision was made to expand the golf course to 18 holes. The full 18 holes of the golf course were completed around 1991. As part of the course, defendant also built a clubhouse and installed a driving range. A portion of the golf course property abuts residential properties in the community.

The Mountain High subdivision was marketed to prospective purchasers as a "golf course community," with flyers, brochures, and advertisements touting the golf course as one of the benefits of living in Mountain High. Josele Ward (Mrs. Ward), who was primarily responsible for sales of property within Mountain High, showed prospective buyers around Mountain High on a golf cart and emphasized Mountain High's qualities as a golf course community. A monument at the entrance to the community included a sign reading "Mountain High Golf Villages," and a fence encircled the entire development, including the golf course.

Defendant remained the owner of the golf course and was responsible for it both financially and operationally. In contrast to the golf course, a swimming pool, tennis courts, and similar community facilities were deeded by defendant to Mountain High. Prospective buyers who asked about the ownership of the golf course were assured that they would not be financially responsible for the golf course and that, if it lost money, that would not be their problem. Furthermore, prospective buyers who asked for assurances that the golf course would remain in place were told that the golf course would continue to be there and that there was no need to worry about it. However, no owner was given a written guarantee that the golf course would be in the community forever. Both Mr. and Mrs. Ward testified at trial that they had

intended that there would continue to be a golf course at Mountain High.

Because of the way that Mountain High was marketed, set up, and presented, buyers understood that it was a golf course community, and association members testified that they considered the golf course to be an integral part of the Mountain High community. Association members testified that they paid a premium to have property in such a community and that the presence of the golf course was essential to their decisions to purchase. However, the property owners did not often play the course, even though many of them enjoyed golf. Instead, the importance of retaining a golf course in the community came from the increased value the golf course brought to their properties and the green space and recreational opportunities that the golf course provided. Expert testimony established that homes on a golf course generally are worth more and appreciate more quickly than similar homes that are not on a golf course. This enhancement of value extends to homes as much as a quarter mile removed from the course. In addition, according to the testimony of the homeowners, the presence of a golf course in the community provided other benefits as well. The golf course was aesthetically pleasing, reduced density in the development, and provided space to walk or pursue other recreational activities.

When Mountain High was originally developed, Juniper Utility (Juniper), a company owned and operated by Mr. Ward, supplied all domestic and irrigation water and sewage services. Because Mr. Ward controlled both Juniper and defendant, he was able to control the cost of irrigating the golf course. In 2002, the City of Bend (the city) brought a condemnation action against Juniper and, ultimately, assumed control of the water and sewer system on April 23, 2002. Defendant did, however, retain some water rights that could be used to irrigate the golf course.

Prior to the city's takeover, Juniper was undercapitalized and, due to its lack of financial resources, was not a well-maintained utility. At the time that the Juniper facilities were transferred to the city, problems occurred that

resulted in no irrigation water being available for the golf course for about a week. As of April 30, 2002, a week after the transfer, the water and irrigation systems for a portion of the golf course were operational, and the remainder of the system was fully operational by May 5. By that time, however, the grass on a number of the greens had died from the lack of water. In spite of those problems, defendant irrigated the golf course throughout the 2002 season.

In early 2003, debris in the irrigation water caused problems with the sprinkler systems for both the golf course and the property maintained by plaintiff. For the 2003 season, defendant irrigated only the portion of the golf course that abutted homes in the subdivision, and the golf course was not open that season. After 2003, defendant did not water or maintain the golf course. Mr. Ward planned to replace the irrigation system using defendant's water rights so that defendant could again control the water source for the golf course. However, as of the April 2005 trial, the grass on the golf course was dead, the vegetation was overgrown, certain portions of the golf course had been actively destroyed, and the golf course had not been reopened for play.

When construction of the golf course began in 1984, there was a shortage of golf courses in the area. In the intervening years, a large number of 18-hole regulation golf courses opened in the vicinity of Mountain High. Before its 2003 closure, the golf course had lost money for a number of years. After plaintiff brought this action, but before trial, defendant was in negotiations to sell the golf course property, along with additional property, to a third party for development. As part of the proposed sale, the new developer would have been required to put in some type of golf course. However, the sale was never finalized. In addition, Mr. Ward explored redeveloping part of the land into a smaller golf course with shorter holes. Prior to trial, defendant executed and recorded a perpetual restrictive covenant covering a portion of the property that had been used for the original nine holes of the golf course and providing that that land could be used only as "open space, natural area, golf course, park, playground or recreation site." At trial, Mr. Ward testified that, whether or not the golf course property was sold to a

developer, the area covered by the restrictive covenant would be redeveloped into a nine-hole executive course.[3]

## THE TRIAL COURT'S JUDGMENT

Having considered the evidence presented, the trial court held that plaintiff had established the elements of an equitable servitude by estoppel. Accordingly, the trial court ruled:

> "[T]he plaintiff is entitled to a judgment that an equitable servitude by estoppel exists to some portion of the [original] nine holes of the Mountain High Golf Course. The equitable servitude benefits the individual lots in the four subdivisions comprising what we call Mountain High, but I am not going to declare that the equitable servitude is the common property and that the homeowners association is the beneficial owner.

> "The equitable servitudes run with the land and they benefit the lots and they burden the portion of the golf course that the Court declares subject to the equitable servitude.

> "All right. We're talking about 9 holes, not 18, for a variety of reasons. First, the basis of the suit here is the commonality, the right of the association to represent the common interests of all of the lot owners. And the evidence is not sufficient and the Court cannot declare that there was an equitable servitude with regard to every lot in Mountain High for 18 holes.

> "* * * * *

> "In terms of an injunction, the evidence does not prove that an 18-hole course is necessary as a remedy to meet the needs of the homeowners themselves, for several reasons at least. One is that the homeowners don't golf very much at the—didn't golf very much at the 18-hole course when it existed, and so they're not using 18 holes of golf themselves. And I think, as [plaintiff's counsel] conceded, nine holes does a pretty good job of restoring the property values. So it's a 9-hole course."

---

[3] The testimony at trial established that an executive course has shorter holes than does a regulation golf course.

Given the testimony about what type and size of golf course would be appropriate for the community, the court went on to discuss the amount of land included in the equitable servitude. Only three options were presented at trial: the existing outline of the original nine holes, the restrictive covenant area, and the design presented by the third-party developer who had considered purchasing the golf course property. Observing that the trial court could not "create a golf course out of whole cloth" and that it did not consider it appropriate at that point to "send the parties back out to negotiate" or itself "propose something that ha[d] not been previously brought to the Court's attention by way of evidence[,]" the court concluded that

> "the only alternative the Court has is to declare an equitable servitude as to the existing north nine holes. I don't know whether that's—today is in the best interests of the homeowners association or J.L. Ward Co. But I think, based upon the evidence that has been received, that is the only alternative for the Court today, and that's what I am going to declare."

The court entered a general judgment declaring the existence of an equitable servitude on the original nine holes of the golf course and benefitting the individual lots within Mountain High. In addition, the judgment included a permanent injunction "to prevent and remedy waste of the Burdened Property," requiring defendant to reconstruct, maintain, and operate the nine-hole golf course for 15 years. This appeal followed.

## ANALYSIS

■ Initially, defendant argues that plaintiff does not have standing to bring this action and that the trial court erred in holding otherwise. Plaintiff counters that that issue was not properly preserved before the trial court. This court will generally not consider an issue on appeal "unless the claimed error was preserved in the lower court." ORAP 5.45(1); *see Ailes v. Portland Meadows, Inc.*, 312 Or 376, 380, 823 P2d 956 (1991) (an issue must generally be preserved if it is to be considered on appeal). The preservation rule is intended to ensure that "the positions of the parties are presented clearly to the initial tribunal and that the parties are

not taken by surprise, misled, or denied an opportunity to meet an argument." *Davis v. O'Brien*, 320 Or 729, 737, 981 P2d 1307 (1995).

■ Here, defendant presented the arguments regarding standing to the trial court. In fact, the parties made lengthy arguments before the trial court, addressing the specific issue that is raised here—that is, whether ORS 94.630 authorized plaintiff, a homeowners association, to bring this action. Furthermore, the trial court specifically found "that the homeowners association may * * * file the complaint bringing the claims alleged pursuant to [ORS] 94.630." At the end of the trial, the court again discussed the issue, and noted that it had already held "that the homeowners association did have standing * * * to bring this suit under the Planned Community Act." After considering some additional information presented during trial, the court, observing that the case was brought under ORS 94.630(1)(e)(C), again concluded "that the homeowners association can bring this suit." As the issue of standing was presented to and considered by the trial court in this case, the issue was preserved. We turn to plaintiff's standing to bring this action.

Relying on this court's decision in *Quail Hollow West v. Brownstone Quail Hollow*, 206 Or App 321, 136 P3d 1139 (2006), *rev dismissed as improvidently allowed*, 343 Or 115 (2007), defendant contends that ORS 94.630(1)(e)[4] does not

---

[4] ORS 94.630(1)(e) provides that a homeowners association may

"Subject to subsection (4) of this section, initiate or intervene in litigation or administrative proceedings in its own name and without joining the individual owners in the following:

"(A) Matters relating to the collection of assessments and the enforcement of governing documents;

"(B) Matters arising out of contracts to which the association is a party;

"(C) Actions seeking equitable or other nonmonetary relief regarding matters that affect the common interests of the owners, including but not limited to the abatement of nuisance;

"(D) Matters, including but not limited to actions for damage, destruction, impairment or loss of use, relating to or affecting:

"(i) Individually owned real property, the expenses for which, including maintenance, repair or replacement, insurance or other expenses, the association is responsible; or

"(ii) Common property;

permit plaintiff to bring suit as a representative of its members. We disagree with defendant's assertion that our holding in *Quail Hollow* conclusively resolves the question of plaintiff's standing to bring this case.

In *Quail Hollow*, the issue we considered was whether an association of townhouse owners had standing to bring an action seeking damages from the developers and builders of the townhouses for construction defects. We explained that ORCP 26 A required actions to be pursued by a real party in interest:[5]

> "Case law describes the rule as recognizing two classes of person who may be regarded as 'real parties in interest' under OCRP 26 A. First there is the class of parties who will be 'benefitted or injured by the judgment in the case.' *Association of Unit Owners v. Dunning*, 187 Or App 595, 607, 69 P3d 788 (2003). Second, there is the class of persons who are 'statutorily authorized to bring an action.' *Id.*"

*Quail Hollow*, 206 Or App at 328. Initially, we concluded that the association would not be benefitted or injured by the judgment in that case. In assessing whether the association was statutorily authorized to bring the action, we remarked that, although ORS 94.630(1)(e) authorizes a homeowners association to sue in its own name, it "does not, by its terms, authorize associations to sue *on behalf of* the individual owners." *Quail Hollow*, 206 Or App at 336 (emphasis in original). We observed that

> "the association purports to sue both in its own name and on behalf of the individual owners. Because the statute does

---

"(E) Matters relating to or affecting the lots or interests of the owners including but not limited to damage, destruction, impairment or loss of use of a lot or portion thereof, if:

"(i) Resulting from a nuisance or a defect in or damage to common property or individually owned real property, the expenses for which, including maintenance, repair or replacement, insurance or other expenses, the association is responsible; or

"(ii) Required to facilitate repair to any common property; and

"(F) Any other matter to which the association has standing under law or pursuant to the declaration or bylaws."

[5] ORCP 26 A requires, in part, that "[e]very action shall be prosecuted in the name of the real party in interest. * * * [A] party authorized by statute may sue in that party's own name without joining the party for whose benefit the action is brought."

not authorize the association to sue on behalf of the individual members, however, it may not do so in this case."

*Id.* We then analyzed whether the statute authorized the association to bring the action on its own behalf and concluded it did not.[6]

Here, although the individual homeowners reap the benefit of the judgment, plaintiff brought the action on its own behalf and contends that it is permitted to do so pursuant to ORS 94.630(1)(e)(C). Thus, the question that we must address is whether this action falls within the scope of that subparagraph.

ORS 94.630(1)(e)(C) permits a homeowners association to "initiate * * * litigation * * * in its own name and without joining the individual owners" in an action "seeking equitable or other nonmonetary relief regarding matters that affect the common interests of the owners, including but not limited to the abatement of nuisance." The parties disagree about how that statutory language should properly be interpreted. Defendant asserts that the term "common interests" within the statute refers to "common property or any interest in common property" or the Declaration of Covenants, Conditions, and Restrictions (CCRs) "or the reciprocal servitudes created by the CCRs that are the property interest common to the community." Because the circumstances at issue in this case do not fall within any of those categories, it is defendant's position that the case does not relate to the "common interests" of the owners. Plaintiff responds that ORS 94.630(1)(e)(C) allows a homeowners association to act in a representative capacity on behalf of homeowners.

To determine the legislature's intended meaning of the statute, we must examine the text of the statute in context. *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009); *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). For purposes of our inquiry, words not defined within the statute are given their plain, ordinary

---

[6] In *Quail Hollow*, we discussed ORS 94.630(1)(e)(A), (D), (E), and (F). *See* 206 Or App at 335-40. We did not consider ORS 94.630(1)(e)(C), the provision at issue in this case.

meaning. *Moon v. Government Standards and Practices Comm.*, 198 Or App 244, 250, 108 P3d 112 (2005).

■ For an association to properly bring an action in equity under ORS 94.630(1)(e)(C), the matter must affect the "common interests" of the "owners." An owner is defined by ORS 94.550(16) as "the owner of any lot in a planned community, unless otherwise specified, but does not include a person holding only a security interest in a lot." The statute does not contain a specific definition for the term "common interests." Accordingly we consult the dictionary for the meaning of that term. The word "common" means shared. *Webster's Third New Int'l Dictionary* 458 (unabridged ed 2002). Furthermore, "interest" is defined, in relevant part, as "**2 a :** the state of being concerned or affected esp. with respect to advantage or well being : GOOD, BENEFIT, PROFIT * * * ‹each faction made concession, in the common ~›." *Id.* at 1178. Thus, ordinarily, a reference to something done in the "common interest" is to an act meant to result in a shared benefit. The text of the statute provides that the "common interests" at stake in an equity action brought pursuant to ORS 94.630(1)(e)(C) must be those of the "owners" as defined above. Accordingly, applying the plain meaning of the statutory text in context, to be brought under ORS 94.630(1)(e)(C), a homeowners association's action must both be aimed at protecting the shared good of the members and relate to the members' status as property owners within the planned community.

As noted, defendant suggests that the term "common interest" departs from the ordinary meaning set forth above and, instead, refers to common property, a common interest in property, or the CCRs that benefit the properties within a planned community. Based on the context of the term as used in the statute, we conclude that defendant's proposed interpretation is not plausible. Unlike "common interest," the term "common property" is specifically defined in the statute. ORS 94.550(7) (" 'Common property' means any real property or interest in real property within a planned community which is owned, held or leased by the homeowners association or owned as tenants in common by the lot owners, or designated in the declaration or the plat for transfer to the association."). Furthermore, a different subparagraph of

ORS 94.630 gives homeowners associations the ability to bring an action concerning the common property of the residential planned community. Specifically, ORS 94.630(1)(e)(D) permits an association to sue in its own name in matters, "including but not limited to actions for damage, destruction, impairment or loss of use, relating to or affecting * * * common property." *See also Quail Hollow*, 206 Or App at 337 (discussing ORS 94.630(1)(e)(D)). Had the legislature intended subparagraph (C) to refer to common property, it could easily have used that term rather than "common interests."

Likewise, because interests in real property are included within the definition of "common property," ORS 94.630(1)(e)(D) authorizes an association to bring actions relating to that type of interest. *See Quail Hollow*, 206 Or App at 337-38 (discussing the phrase "interest in property" as used in the statute). Another statute admonishes the courts not to insert language into statutes that has been omitted; rather, the courts interpret the language the legislature used. ORS 174.010. In light of those statutory provisions, we decline to insert language into the statute to interpret "common interest" to mean "common interest in property" as defendant advocates. Similarly, a different statute already specifically provides that an association may bring actions relating to enforcement of the governing documents. ORS 94.630(1)(e)(A); *Quail Hollow*, 206 Or App at 336-37 (discussing subparagraph (A)).

All of those statutory provisions undercut defendant's argument that the legislature intended the term "common interest" to refer only to the specific types of interests defendant describes. *See PGE*, 317 Or at 611 ("use of a term in one section and not in another section of the same statute indicates a purposeful omission"). In sum, based on our examination of the text of the statute in context, we conclude that the term "common interest" within ORS 94.630(1)(e)(C) is unambiguous and the legislature intended that the term be used in the plain and ordinary sense.

■ Based on that understanding of subparagraph (C), it was appropriate for the association to bring this action. The statute lists nuisance actions as an example of one type of

action protecting the common interests of the owners in a community. This case meets the requirements of the statute and also is similar in type to the example provided. As discussed above, all the Mountain High owners benefitted from the presence of the golf course and its benefits of open space, recreational opportunities, and decreased density within the community. As well, the course provided aesthetically pleasing green space and increased the values and the rates of appreciation of the properties within the community. On the other hand, when the golf course was left without water and otherwise not maintained, the values of the properties within the community were negatively affected. As a result of the degradation of the golf course, the community as a whole and all the homeowners individually suffered losses of the benefits they expected as part of their memberships in the community. As owners of property within Mountain High, plaintiff's members all have an interest in protecting or restoring the benefits provided by that golf course. The evidence in this case establishes that this action was brought to protect the shared interests of plaintiff's members relating to their status as property owners within Mountain High. We conclude that the trial court properly held that, pursuant to ORS 94.630(1)(e)(C), plaintiff had standing to bring this case.

In its second assignment of error, defendant asserts that the trial court erred in declaring the existence of an equitable servitude on the original nine holes of the golf course. Specifically, it is defendant's position that the evidence presented at trial was insufficient to satisfy the requirements for an equitable servitude by estoppel, as set forth in the *Restatement (Third) of Property : Servitudes* § 2.10 (1998).

■ The *Restatement* provides:

"If injustice can be avoided only by establishment of a servitude, the owner or occupier of land is estopped to deny the existence of a servitude burdening the land when:

"(1) the owner or occupier permitted another to use that land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be revoked, and that user did substantially change position in reasonable reliance on that belief; or

"(2) the owner or occupier represented that the land was burdened by a servitude under circumstances in which it was reasonable to foresee that the person to whom the representation was made would substantially change position on the basis of that representation, and the person did substantially change position in reasonable reliance on that representation."

*Restatement* at § 2.10; *see also Ebbe v. Senior Estates Golf*, 61 Or App 398, 657 P2d 696 (1983) (discussing equitable servitudes). Thus, an equitable servitude by estoppel may be created as the result of (1) either an express or implied representation made under circumstances where (2) it is reasonably foreseeable that the person to whom the representation is made will rely on it, (3) that person does so rely, (4) such reliance is reasonable, and (5) the establishment of a servitude is necessary to avoid injustice.

■ Our review of the record convinces us that the elements set forth above are satisfied in this case. Defendant represented to buyers that Mountain High was and would continue to be a golf course community. That representation was made both expressly and impliedly. It was reasonably foreseeable that, in deciding whether to purchase land within Mountain High, a prospective buyer would rely on those representations and substantially change position as a result of that reliance. The owners did, in fact, purchase property in Mountain High, substantially changing their positions as a result of defendant's representations. It was reasonable for buyers to rely on the representations of the developer of Mountain High and the owner of the Mountain High golf course in making their decisions to purchase in the community. Under all the circumstances, including the condition of the golf course property as of the date of trial in this case, it would be unjust for defendant to benefit from the successful marketing of Mountain High as a "golf course community" without the imposition of the servitude. Accordingly, we conclude that the trial court did not err in declaring the existence of the equitable servitude.

Finally, in its last two assignments of error, defendant contends that the trial court erred in granting injunctive relief on plaintiff's claim for waste based on the equitable servitude. It further states that the scope of the servitude is

such that it requires only that defendant refrain from establishing anything other than a golf course on the subject property. In other words, defendant claims it could properly do nothing with the property under the terms of the servitude. Plaintiff responds that the waste claim was appropriate. In any event, according to plaintiff, the trial court has broad equitable power to fashion a remedy to enforce the terms of the servitude and could have ordered the same relief pursuant to the equitable servitude claim.

 "A court in equity has broad discretion in crafting relief." *Port of Morrow v. Aylett*, 186 Or App 70, 76, 62 P3d 427 (2003). Courts in such cases have the power to fashion remedies that are appropriate given the particular circumstances presented. *Ballinger v. Klamath Pacific Corp.*, 135 Or App 438, 450 n 10, 898 P2d 232, *rev den*, 322 Or 360 (1995). Furthermore, parties in equity may obtain relief not sought in their complaint provided that such relief appears to have been reasonably contemplated by the parties and is not a substantial departure from the pleadings. *Port of Morrow*, 186 Or App at 76-77.

The trial court in this case made clear its view that fairness required the restoration of a nine-hole regulation-sized golf course to the Mountain High community. That is because, as discussed above, such a course was contemplated and under development when defendant began selling property in Mountain High and the presence of at least that size and style a course was reasonably expected by purchasers in the "golf course community." As the trial court recognized, it would be inequitable to permit defendant to do nothing and allow the golf course property to return to its natural state. Furthermore, as the trial court noted, defendant intended to reestablish a nine-hole executive-style golf course on some portion of the servitude property or to require any purchaser of the servitude property to install a golf course thereon to satisfy its obligation to provide the homeowners with a "golf course community."

 With those circumstances in mind, the injunctive relief that the trial court awarded was part of a larger equitable scheme to require defendant to provide to the homeowners the benefits to which they were equitably entitled as

a result of the express and implied representations made in defendant's marketing of the properties in Mountain High. Accordingly, we read the provisions of the judgment together and conclude that the intended scope of the servitude was encompassed by both the negative requirement that defendant not use the property for anything other than a golf course in perpetuity as well as the affirmative duty that defendant provide a golf course, at least for the particular time period specified. Given the court's broad equitable powers, we conclude that the trial court could and did properly fashion remedies intended to address the particular facts of this case. We further conclude that the relief that the trial court granted was appropriate in those circumstances.

Furthermore, we conclude that the trial court could appropriately grant relief for waste in this case. Waste occurs when a person or entity in possession of land, by act or omission, causes a decrease in value of the property interest in that land held by another who does not have possession. *Whistler v. Hyder*, 129 Or App 344, 349, 879 P2d 214, *rev den*, 320 Or 453 (1994). A servitude is an interest in real property. *Ploplys v. Bryson*, 188 Or App 49, 57, 69 P3d 1257 (2003). Thus, the trial court's judgment recognized the existence of a real property interest when it declared that the land comprising the original nine holes of the golf course was burdened by an equitable servitude for the benefit of all of the lots in Mountain High. To the extent that defendant, the party in possession of the real property in which the homeowners have an interest, by its acts and its omissions, has negatively affected the homeowners' interests and caused them to lose value, the court could properly grant relief for waste.

In sum, the relief granted by the trial court was legally permissible and just and equitable under the circumstances.

Affirmed.