Argued and submitted September 5, 2019, general and supplemental judgments affirmed December 29, 2021

CREEKSIDE HOMEOWNERS ASSOCIATION, INC.,
an Oregon nonprofit corporation,
*Plaintiff-Appellant,*

*v.*

CREEKSIDE GOLF COURSE, LLC,
an Oregon limited liability company,
dba Creekside Golf Club; and
Creekside Golf Operations, LLC,
also dba Creekside Golf Club,
*Defendants-Respondents.*

Marion County Circuit Court
16CV13722; A165800

505 P3d 15

Plaintiff Creekside Homeowners Association brought this action pursuant to ORS 28.020, seeking a declaration that defendant Creekside Golf Course, LLC, the owner of Creekside Golf Course, and the golf club's operator, defendant Creekside Golf Club Operations, LLC (collectively, "defendants"), are prohibited by a Declaration of Covenants, Conditions and Restrictions (CC&Rs) and the doctrines of equitable servitude and waste from eliminating the course. After a trial to the court, plaintiff appeals a general judgment entering a declaration for defendants and a supplemental judgment awarding defendants $422,788.71 in attorney fees and costs. *Held*: The CC&Rs give defendant Creekside Golf Course, LLC exclusive power to determine the use of the property, and the trial court therefore did not err in declaring that the CC&Rs do not prohibit defendants from ceasing to operate a golf course and that plaintiff cannot prevent defendants from developing the golf course real property for residential use. Thus, the trial court did not err in awarding attorney fees to defendants as provided in the CC&Rs. The trial court also did not err in rejecting plaintiff's request for declarations that defendants committed waste or were equitably estopped from ceasing to maintain a golf course on the property.

General and supplemental judgments affirmed.

Karsten H. Rasmussen, Judge. (General Judgment)

R. Curtis Conover, Judge. (Supplemental Judgment)

Brad S. Daniels argued the cause for appellant. Also on the briefs were James N. Westwood and Stoel Rives LLP.

C. Robert Steringer argued the cause for respondents. Also on the brief were James E. Mountain, Erica R. Tatoian and Harrang Long Gary Rudnick P. C.

Before DeHoog, Presiding Judge, and Mooney, Judge, and Kamins, Judge.*

MOONEY, J.

General and supplemental judgments affirmed.

DeHoog, P. J., dissenting.

_____

* Kamins, J., *vice* Hadlock, J. pro tempore.

**MOONEY, J.**

Plaintiff Creekside Homeowners Association brought this action pursuant to ORS 28.020, seeking a declaration that defendant Creekside Golf Course, LLC, the owner of Creekside Golf Course, and the golf club's operator, defendant Creekside Golf Operations, LLC (collectively, "defendants"), are prohibited by a Declaration of Covenants, Conditions and Restrictions (CC&Rs) and the doctrines of equitable servitude and waste from eliminating the course. After a trial to the court, plaintiff appeals a general judgment entering a declaration for defendants and a supplemental judgment awarding defendants $422,788.71 in attorney fees and costs. We have reviewed the CC&Rs and agree with the trial court that they do not require defendants to maintain a golf course in perpetuity; nor do the doctrines of equitable servitude or waste apply. The trial court therefore did not err in rejecting plaintiff's contentions and entering a declaration for defendants.

We draw our summary of the facts from the trial court's extensive findings and the undisputed facts in the record. Defendant Creekside Golf Course, LLC is the successor-in-interest to Hawaii Northwest Ventures Limited Partnership (Hawaii Northwest), which, in 1991, purchased approximately 328 acres in Marion County to develop as a residential subdivision and an 18-hole golf course.

In 1992, Hawaii Northwest executed and recorded CC&Rs for the planned development. The legal description for the entire development, including the golf course, is stated in Exhibit A to the CC&Rs; Exhibit B to CC&Rs states the legal description of only the real property to be developed as residential. As parcels were subdivided and platted for development, they became part of "Golf Course Estates At Creekside" and subject to the CC&Rs. Plaintiff is an association of homeowners of Golf Course Estates At Creekside.

We set forth those portions of the CC&Rs that bear on the issues on appeal, with the key provisions highlighted in italics. The CC&Rs' recitals state:

"Declarant intends to create a residential development *** together with a golf course and other improvements upon the property described in Exhibit A. *Neither the association nor any service association shall have any interest in or control over the golf course and related facilities.* The residential development shall be created on those portions of the property described in Exhibit B, attached hereto and by this reference made a part hereof (which portions are hereinafter referred to as 'the Residential Development' or 'the Community'); and shall be created under the name of 'Golf Course Estates At Creekside.'"[1]

From the outset, the CC&Rs declare that the association will have "no interest in" the golf course. We recognize that recitals do not govern a contract's meaning, but they can help to determine a party's intent. *Erickson Hardwood Co. v. North Pacific Lumber*, 70 Or App 557, 565, 690 P2d 1071 (1984), *rev den*, 298 Or 705 (1985).

The CC&Rs then describe generally the components of the development and set forth the restrictions applicable to the residential community. Article I consists of definitions of terms. The "declarant" is Hawaii Northwest

---

[1] The recitals further state:

"Declarant wishes to ensure that the residential development which occurs on the property described in Exhibit B is of high quality and is harmonious with and complementary to the golf course and other improvements to be constructed on the property described in Exhibit A. Declarant further desires to enhance and preserve the value and desirability of the property described in Exhibit A and its component parts. Declarant also wishes to provide a mechanism to govern the development, improvement, use, maintenance and repair of certain common areas to be established within the property described in Exhibit A.

"*To accomplish the foregoing ends, the Declarant desires to submit the residential development described in Exhibit B to the force and effect of this declaration.*

"NOW, THEREFORE, the Declarant declares that each parcel of real property which is situated within the community, as and when it is platted as a part of Golf Course Estates at Creekside, shall thereafter be sold, conveyed, developed, owned, occupied and used subject to the provisions of this declaration. Each person and entity acquiring any interest in any such parcel, or in all or any portion of any improvement situated upon any such parcel, by and upon acceptance of the land sale contract, deed or other instrument creating or conveying said interest, thereby covenants and agrees to abide by and comply with all of the covenants, conditions and restrictions contained in this declaration."

(Emphasis added.)

"and any successor or assign thereof specified as a successor Declarant in a written agreement between the parties." "Property" is defined as the platted residential development, improvements and common areas, excluding the golf course and its facilities.[2] Thus, as residential subdivisions are platted, they become "Property" subject to the CC&Rs.

Article III describes the phased development of the platted property, the types of living units, the formation of service associations for any condominiums or group of related living units, common property, and, in general terms, the golf course.

Article III, section 4, states the declarant's or successor golf course owner's rights to develop a golf course and related facilities, and to modify, expand, contract, discontinue, convert, transfer, or sell the golf course and related facilities:

> "A portion of the real property described in Exhibit A *may be* developed as a golf course and related facilities. The golf course and related facilities may be modified, expanded or contracted, *discontinued or converted to other uses*, or sold or transferred by the owner thereof, and the use of the golf course and related facilities may be restricted to private members, all as more fully described in Article VII."

(Emphases added.)

Article VII, section 1, in turn, declares that "[a] portion of the real property described in Exhibit A shall consist of the golf course ***." Article VII then describes in more detail the rights and obligations of the golf course owner, and also declares the unit owners' assumption of the risk of

---

[2] Article I defines "Property":

"'Property' means each parcel of real property on which Declarant records a plat and declares all or portions thereof to be part of Golf Course Estates at Creekside. 'Property' also means all improvements and fixtures located on the property. 'Property' includes tracts of common property identified as such on the recorded plat, whether or not such tract has been conveyed to the association. 'Property' does not include any portion of the real property described in Exhibit A unless and until the plat and declaration for such portion are recorded by Declarant. *'Property' does not include the golf course and facilities related thereto even though a portion of the course or related facility may be depicted on a recorded plat.*"

(Emphasis added.)

the hazards of living near a golf course, as well as the risk that changes in the course's layout may adversely affect the "view from or value of their respective lot."[3]

Article VIII describes the declarant's easements for purposes of the residential development, the unit owners'

---

[3] Article VII provides:

"Section 1:   Golf Course. *A portion of the real property described in Exhibit A shall consist of the golf course and related facilities.* ***

"Section 2:   Golf Course Owner Bound by Declaration. Although the golf course and related facilities will not be platted as part of the property and the owner thereof will not be a member of the association, *the Declarant and all successive owners of the golf course and related facilities shall be bound by and benefited by the provisions of this declaration appertaining to the golf course and related facilities.*

"Section 3:   *Rights Regarding Layout of Golf course and Related Facilities.* The Declarant shall have the right to design, layout and construct the golf course and related facilities upon those portions of the property described in Exhibit A which are not within the Property in such manner as may be elected by the Declarant and any successor in interest thereto; and there-after, *the owner of the golf course and related facilities shall have the right to modify, expand or contract the layout of the golf course and to modify, expand, contract, eliminate, construct or move the location of any related facility,* from time to time; provided, however, that no such modification or change shall alter the boundary lines of any portion of the property. The owner of the golf course and related facilities shall have the further right to restrict the use of the golf course, the related facilities or both to private members on such terms and conditions as the owner desires.

"Section 4:   Golf Course Owner's Obligations. The owner of the golf course *shall be obligated to reasonably maintain the appearance of the golf course* and related facilities, and to reasonably maintain any streams, ponds or lakes on the golf course so as to deter the reproduction of mosquitoes and other noxious insects.

"Section 5:   Assumption of Risk. All owners and occupants of a lot or living unit on the property assume the risk of injury to persons or of damage to property caused by the errant golf balls of users of the golf course, and by the incidental trespass of such persons in retrieving golf balls; and shall hold the Declarant, the owner of the golf course and users of the golf course harmless from any claims for such injury or damage to persons or property. *All owners and occupants of a lot or living unit further assume the risk that the view from or value of their respective lot or living unit may be adversely affected by the modifications, changes and restrictions which the owner of the golf course is permitted to make, from time to time, pursuant to Section 3 of this article; and agree to assert no claim against the Declarant or owner of the golf course by reason thereof.*

"Section 6:   No Right of Access. No owner or occupant of a lot or living unit shall have a right of access to or right of use of the golf course or any portion thereof or facility related thereto except those rights, if any, granted from time to time by the owner of the golf course to such persons as users or members of the golf course."

(Emphases added.)

easements for use of common areas and their own residential properties, and the golf club owner's easement.

In 1995, Hawaii Northwest sold the golf course to National Golf Operating Partnership, L.P. (NGP), defendants' immediate predecessor-in-interest. Hawaii Northwest retained the property described in Exhibit B subject to residential development and granted to NGP a "Golf Play Easement," for limited access over the residential property for: (1) the retrieval of golf balls; (2) the flight of golf balls; (3) acts necessary to the playing of golf, such as operation of lighting facilities; (4) the creation of noise related to normal maintenance and operation; (5) the overspray of pesticides; (6) operation of golf carts and related vehicles; (7) ingress/egress over and across rights-of-way within the residential development; and (8) signage. The Golf Play Easement provides that the residential property owners assume the risk of damage and injury from errant golf balls and agree to indemnify the course owner from related liability. The easement states:

> "NGP SHALL HAVE NO OBLIGATION TO PROVIDE, OR TO CONTINUE THE OPERATION OF, ANY IMPROVEMENTS ON THE GOLF COURSE PROPERTY, INCLUDING, BUT NOT LIMITED TO, A GOLF CLUB."

(Uppercase in original.)[4] Unit owners' lots are subject to the easement, but plaintiff is not a party to the easement.

---

[4] The easement includes a provision bearing on the relationship of the unit owners and the golf course:

> "Notice to Property owners Within The Development. NO OWNER OF PROPERTY OR A LOT WITHIN THE DEVELOPMENT SHALL HAVE ANY RIGHTS IN OR TO THE GOLF COURSE OR OTHER AMENITIES LOCATED ON THE GOLF COURSE PROPERTY, OR ANY RECREATIONAL ACTIVITIES OCCURRING THEREON, INCLUDING, BUT NOT LIMITED TO, A VISUAL OR SIGHT EASEMENT OVER AND ACROSS ANY PORTION FOR THE GOLF COURSE PROPERTY, RIGHTS OF MEMBERSHIP IN OR TO THE GOLF COURSE, OR RIGHT OF ACCESS TO OR ACROSS THE GOLF COURSE PROPERTY, UNLESS SUCH RIGHT OR RIGHTS HAVE BEEN GRANTED OR CONVEYED IN WRITING BY NGP OR ITS SUCCESSORS AND ASSIGNS. NGP SHALL HAVE NO OBLIGATION TO PROVIDE, OR TO CONTINUE TO PROVIDE THE OPERATION OF, ANY IMPROVEMENTS ON THE GOLF COURSE PROPERTY, INCLUDING, BUT NOT LIMITED TO, A GOLF CLUB."

(Uppercase and underscoring in original.)

Hawaii Northwest began construction of the golf course in 1993 and completed it 1994. The course occupies 154 acres and consists of 18 holes and related facilities, including a clubhouse, swimming pool, maintenance sheds, and training facility. Defendant, doing business as Creekside Golf Operations, LLC, leases and operates the course.

Hawaii Northwest recorded the first plat for residential development in September 1992. In 1993, Hawaii Northwest began developing and selling residential lots interspersed within and around the perimeter of the golf course. Marketing efforts emphasized the enhanced quality and value of the lots because of the presence of the course. Approximately 20 percent of the units in the subdivisions have golf course frontage. The golf course is not included on any subdivision plat.

The golf course struggled financially and, in 2015, defendants proposed that plaintiff purchase the course or, in the alternative, that plaintiff's members be assessed a monthly fee to help support the course. When plaintiff declined to provide its members' financial support, defendants announced plans to subdivide the entire course for residential development. Plaintiff brought this action, seeking a declaration that the CC&Rs require that defendants maintain a golf course in perpetuity or that, as a result of defendants' marketing of the lots as part of a "golf course community" and unit owners' reasonable expectations, plaintiff is the beneficiary of an equitable servitude by estoppel or implication on the golf course that prevents its development. After trial, the trial court dismissed plaintiff's claims. It issued a declaration that the CC&Rs do not prohibit defendants from ceasing to operate a golf course and that plaintiff may not prevent defendants from developing the golf course real property for residential use.

On appeal, plaintiff assigns error to the court's declaration that the CC&Rs do not prohibit defendants from converting the golf course to a residential development. The interpretation of CC&Rs is a question of law that we review for legal error. *Eagle-Air Estates Homeowners Assn. v. Haphey*, 272 Or App 651, 656, 354 P3d 766 (2015), *rev den*, 359 Or 166 (2016).

We interpret the CC&Rs under the template established in *Yogman v. Parrott*, 325 Or 358, 361-64, 937 P2d 1019 (1997). We examine first the text of the disputed provisions in the context of the document as a whole. *Id.* at 361.[5] If the document's meaning is clear, our analysis ends. Our examination of the CC&Rs leads us to conclude that the document unambiguously expresses that plaintiff has no role in the oversight of the golf course or ability to restrict defendants' conversion of the golf course into a residential subdivision.

Plaintiff's primary argument is that Article VII, section 1, stating that "[a] portion of the real property described in Exhibit A *shall* consist of the golf course," is an unambiguous permanent dedication of a golf course in perpetuity on a portion of the real property described in Exhibit A. (Emphasis added.) Plaintiff cites Article VII, section 3, which describes the golf course owner's rights regarding the layout the golf course, as supportive of its interpretation of Article VII, section 1. As plaintiff points out, Article VII, section 3, permits the owner to eliminate golf-course-related facilities but does not explicitly authorize elimination of the layout or the course itself. In plaintiff's view, the inference must be made that the declarant did not intend to give itself the power to eliminate the course. Plaintiff further cites the statement at Article VII, section 2, that "the Declarant and all successive owners of the golf course and related facilities shall be bound by and benefited by the provisions of this declaration appertaining to the golf course and related facilities," in support of its view that the declarant and its successors and assigns are bound by the requirement in Article VII, section 1, that a golf course *shall* exist on real property described in Exhibit A. Plaintiff also cites the declarant's/golf course owner's upkeep and maintenance obligations described in Article VII, section 4, in particular, its obligation to maintain *the appearance* of the

_____

[5] In determining whether a contract term is ambiguous, a court must also consider evidence of the circumstances of contract formation, *if* that evidence is provided by the parties. *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 317, 129 P3d 773, *rev den*, 341 Or 366 (2006). Here, as in *Yogman*, the parties do not rely on evidence of the circumstances of contract formation to argue that the contract is or is not ambiguous. *See id.* at 315-16 (explaining that *Yogman* omitted that step of the analysis because no such evidence was presented in *Yogman*).

golf course, as a further support for plaintiff's view that Hawaii Northwest intended unambiguously to bind itself and its assigns to maintain a golf course on a portion of the property described in Exhibit A, in perpetuity. The golf course's continued existence, in plaintiff's view, is for the duration of the CC&Rs—that is, until plaintiff's members vote to amend or rescind them.[6] Thus, in plaintiff's view, under the CC&Rs, only plaintiff's members may eliminate the golf course. Until such time, in plaintiff's view, defendant is bound to maintain a golf course.

The difficulty with plaintiff's interpretation is that it is directly contradicted by the only provision that speaks directly to the issue. Article III, section 4, states:

> "A portion of the real property described in Exhibit A *may* be developed as a golf course and related facilities. The golf course and related facilities may be modified, expanded or contracted, *discontinued or converted to other uses* or sold or transferred by the owner thereof, and the use of the golf course and related facilities may be restricted to private members, all as more fully described in Article VII."

(Emphases added.) Plaintiff notes the cross-reference in Article III, section 4, to Article VII, and explains that the two sections must be construed together to the end that, to the extent they are inconsistent, Article VII, as the "more specific" provision, controls.

Plaintiff is correct that the provisions of the CC&Rs must be examined together in the context of the document as a whole. *Yogman*, 325 Or at 361. But, contrary to plaintiff's view, when Article III, section 4, and Article VII, section 1, are read together, in the context of the CC&Rs as a whole, they are not inconsistent; further, Article VII is not more specific than Article III, section 4.

---

[6] The CC&Rs state their duration:

"The covenants and restrictions of this declaration shall run with and bind the land for a term of 20 years from the date of this declaration being recorded, after which time they shall be automatically extended for successive periods of ten years each, unless rescinded by a vote of at least 75 percent of each class of members and approved by 75 percent of the holders of first mortgages and first trust deeds on lots and living units."

Article III, section 4, gives to the declarant general power to develop a golf course on real property described in Exhibit A ("A portion of the real property described in Exhibit A *may* be developed as a golf course and related facilities." (Emphasis added.)). Article III, section 4, further assigns to the declarant the power to restrict use of the golf course facilities to members only, and to modify, expand or contract, discontinue, or convert the golf course or its facilities to other uses, or to sell or transfer the golf course. The CC&Rs in essence give to the declarant/golf course owner plenum power over the real property described in Exhibit A, including the power to "discontinue[] or convert[]" the golf course to other uses, or to sell it.

It is true, as plaintiff contends, that Article III, section 4, states that the authority granted under that section is "more fully described in Article VII." Under plaintiff's interpretation of Article VII, the full authority over the real property granted in Article III is subject to a restriction in Article VII that the golf course's use can never change. That interpretation eviscerates the power reserved to the declarant under Article III, section 4, and, for that reason, it is not plausible. Article VII must be understood to be subject to the declarant's general authority stated in Article III, section 4, and not the converse. That is the only reading of the document that gives both sections meaning. *See* ORS 42.230 (requiring courts to interpret an instrument, if at all possible, so as to give effect to all of its provisions); *Slocum v. Lang*, 132 Or App 571, 576, 889 P2d 379 (1995) ("We must construe a contract as a whole, so that no part of it is ignored and effect can be given to every word and phrase.").

Understood in that light, the reference in Article VII, section 1, to *the* golf course refers back to the golf course that Article III, section 4, says the declarant *may* develop *and may also eliminate or convert* on a portion of the property described in Exhibit A. *See State v. Lykins*, 357 Or 145, 159, 348 P3d 231 (2015) ("As a grammatical matter, the definite article, 'the,' indicates something specific, either known to the reader or listener or uniquely specified."). Article VII, section 1, is, simply, a reiteration of the statement in Article III, section 4, that the golf course that is permitted to be developed must be located on a portion of

the property described in Exhibit A. Article VII, section 1, does not impose an obligation on the declarant or golf course owner to build or operate a course in perpetuity. Nor does Article VII, section 1, override the declarant's prerogative, stated in Article III, section 4, to discontinue or convert the golf course to other uses.

Contrary to plaintiff's argument, Article VII, section 3 ("Rights Regarding Layout of Golf Course and Related Facilities"), relates to the *layout* of course; it has no bearing on whether the declarant is permitted to convert the golf course to a residential development. Other sections of the CC&Rs are consistent with the declarant's/golf course owner's exclusive right to determine the use of the real property on which the golf course is situated. For example, as noted, the recitals state that "[n]either the [homeowners] association nor any service association shall have any interest in or control over the golf course and related facilities." Article VII, section 5, states that unit owners assume the risk of loss of views or property values associated with any modifications of the golf course. In short, under the CC&Rs, the declarant's power to determine the use of the property is exclusive.

Plaintiff notes that the Golf Play Easement, between defendant's predecessors, states in its recitals that "Hawaii and NGP desire to provide for creation of certain easements, covenants and restrictions, on the Development, *in order to ensure the continued operation of the Golf Course.*" (Emphasis added.) In plaintiff's view, that recital, in an easement document binding defendant's predecessors, demonstrates an intention to maintain a golf course in perpetuity. Contrary to plaintiff's contention, the Golf Play Easement, executed several years after the CC&Rs, has no bearing on our interpretation of the CC&Rs. If anything, the easement, to which the unit owners' lots are subject, and which provides that "NGP SHALL HAVE NO OBLIGATION TO PROVIDE, OR TO CONTINUE THE OPERATION OF, ANY IMPROVEMENTS ON THE GOLF COURSE PROPERTY, INCLUDING, BUT NOT LIMITED TO, A GOLF CLUB," reinforces our conclusion that plaintiff has no right to require the continued maintenance of the golf course property as a golf course. (Uppercase in original.) We conclude that the trial

court did not err in declaring that the CC&Rs do not prohibit defendants from ceasing to operate a golf course and that plaintiff may not prevent defendants from developing the golf course real property for residential use.

In light of our conclusion, we reject plaintiff's second assignment of error, challenging the trial court's award of attorney fees to defendants as provided in the CC&Rs.

In its third assignment of error, plaintiff contends that the trial court erred in concluding that plaintiff had not established an equitable servitude, either express or implied, that requires the maintenance of a golf course in perpetuity. Because we have concluded that the CC&Rs do not restrict defendants' ability to convert the golf course to a residential subdivision, we also reject plaintiff's contention that the CC&Rs themselves create an equitable servitude. The remaining question is whether plaintiff has established a servitude resulting from representations of the golf course, both express and implied, made by Hawaii Northwest and its agents in documents and in the marketing of the residential lots.

In *Mountain High Homeowners Assn. v. J. L. Ward Co.*, 228 Or App 424, 438, 209 P3d 347 (2009), we described the elements of an equitable servitude:

"(1) [E]ither an express or implied representation made under circumstance where (2) it is reasonably foreseeable that the person to whom the representation is made will rely on it, (3) that person does so rely, (4) such reliance is reasonable, and (5) the establishment of a servitude is necessary to avoid injustice."

*Mountain High* also involved a golf course in a development and a claim that the developer had promised to maintain the golf course indefinitely. There, we reviewed the record *de novo* and found that the plaintiff homeowners' association had established that the developer had represented to prospective purchasers that the development would "continue to be a golf course community," that it was reasonably foreseeable for prospective buyers to rely on that representation and change their position as a result, and that the lot owners did, in fact, rely on the developer's representations in purchasing lots. *Id.* We held that "it would be

unjust for defendant to benefit from the successful marketing of Mountain High as a 'golf course community' without the imposition of the servitude." *Id*.

Plaintiff asserts that *Mountain High* is "spot on" with this case and requires the imposition of an equitable servitude here. Plaintiff has asked us to review the record *de novo*, make new findings, and so conclude. However, we decline to review the record *de novo*. *See* ORAP 5.40(8)(c) (stating that this court exercises its discretion to review *de novo* "only in exceptional cases"). Thus, we are bound by the trial court's findings if there is any evidence in the record to support them. *Eagles Five, LLC v. Lawton*, 250 Or App 413, 415 n 2, 280 P3d 1017 (2012).

A key factual finding distinguishes this case from *Mountain High*: In *Mountain High* we found that the developer "represented to buyers that Mountain High was and would continue to be a golf course community. That representation was made both expressly and impliedly." 228 Or App at 438. The trial court here found that plaintiff "has not established by clear and convincing evidence that an express or implied representation was made to any lot owner that the course would be maintained by the course owner into the future." That finding is fatal to plaintiff's claim.

The court here also found that plaintiff "did not prove by clear and convincing evidence that its members relied on any express or implied representation that the golf course would exist in perpetuity or for some future duration." Additionally, the court concluded that the evidence was insufficient to permit a finding that subsequent owners of the course—NGP and defendants—had actual or constructive knowledge of any equitable servitude at the time of the transfers. *See Ebbe v. Senior Estates Golf*, 61 Or App 398, 405, 657 P2d 696 (1983) (promise is binding as an equitable servitude if, among other things, "the subsequent grantee [has] notice of the covenant, either actual or constructive" (brackets in original)).

Under our standard of review, we examine the record to determine whether any evidence supports the trial court's findings. *Eagles Five, LLC*, 250 Or App at 415 n 2. Plaintiff does not make specific challenges to the trial court's findings

but raises only the general contention that the court's findings depart from the evidence.[7] However, we have reviewed the record and conclude that trial court's specific findings are supported by the record and support the trial court's determination that plaintiff has not met its burden to establish by clear and convincing evidence that the golf course is subject to an equitable servitude either expressed or implied from the circumstances.

In light of our conclusion that the trial court did not err in declaring that the CC&Rs do not prohibit defendants from ceasing to operate a golf course and that plaintiff may not prevent defendants from developing the golf course real property for residential use, we affirm without discussion plaintiff's assignment that the trial court erred in rejecting its claim of waste based on defendants' planned conversion of the golf course to a residential subdivision.

General and supplemental judgments affirmed.

**DeHOOG, P. J.,** dissenting.

In this case, both sides to the litigation have consistently contended that the Declaration of Covenants, Conditions and Restrictions (CC&Rs) at the heart of this case unambiguously support their respective views of their rights under that document. The trial court, agreeing that the CC&Rs are unambiguous, adopted defendants' view as to what those rights unambiguously are. The majority opinion, resorting to the familiar contract-interpretation template set forth by the Supreme Court in *Yogman v. Parrott*, 325 Or 358, 937 P2d 1019 (1997), similarly agrees that the CC&Rs are unambiguous, and likewise adopts defendants' view as to what they mean. 316 Or App at 654; *see Eagle-Air Estates Homeowners Assn. v. Haphey*, 272 Or App 651, 656, 354 P3d 766 (2015), *rev den*, 359 Or 166 (2016) (stating that

---

[7] We have not previously considered the standard of proof applicable to a claim to establish an equitable servitude by implication, and the standard of proof does not appear to be at issue or disputed on appeal. But we agree with defendants and with the trial court that, in view of the equitable interests at stake in imposing an equitable servitude on the property of another by implication, the standard of proof should be the same as the clear and convincing standard applicable to implying other forms of burdens on real property, such as a prescriptive easement. *See Wels v. Hippe*, 360 Or 569, 581, 385 P3d 1028 (2016), *modified on recons*, 360 Or 807, 388 P3d 1103 (2017) (applying clear and convincing standard to establish a prescriptive easement).

the interpretation of CC&Rs is a question of law that we review for legal error); *see also Valenti v. Hopkins*, 324 Or 324, 926 P2d 813 (1996) (acknowledging Supreme Court's treatment of restrictive covenants as contractual obligations of homeowners and applying generally applicable rules of contract interpretation to them).

As a general matter, I agree with the majority's approach to this case. Where I part ways, however, is in the majority's assessment of the various terms of the CC&Rs and its ultimate assessment that they unambiguously support defendants' view and the trial court's ruling. I would instead conclude that those terms, viewed together and in the context of the CC&Rs as a whole, can plausibly be read to support either side's view—that is, the CC&Rs are *ambiguous* regarding the central issue in this dispute. *See Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 313, 129 P3d 773, *rev den*, 341 Or 366 (2006) ("A contract provision is ambiguous if it has no definite significance or if it is capable of more than one sensible and reasonable interpretation[.]").

I would further conclude that the trial court—and this court—are required to consider that possibility notwithstanding the parties' shared view that the CC&Rs are unambiguous. *See Couch Investments, LLC v. Peverieri*, 359 Or 125, 132-34, 371 P3d 1202 (2016) (finding parties' arbitration agreement to be ambiguous notwithstanding position of both parties that agreement was unambiguous). Finally, upon properly recognizing the CC&Rs to be ambiguous, the trial court should have proceeded to resolve that ambiguity as required by *Yogman* and its progeny. Because the trial court did not recognize that ambiguity, it skipped that step, adopted defendants' view of the document's meaning, and dismissed plaintiff's declaratory judgment action. That, in my view, was error. I will briefly explain my reasoning.[1]

---

[1] In earlier summary-judgment proceedings, another trial judge, in a thorough written opinion, ruled that the CC&Rs unambiguously supported plaintiff's view that the golf course could not be eliminated in its entirety. However, that judge later ruled that her decision would not be binding on the parties without their consent, and the matter was decided anew at trial. That ruling is not at issue on appeal. Although the first judge (like the judge who heard the trial) determined that the CC&Rs were unambiguous, whereas I conclude that they are ambiguous, I agree with much of the first court's reasoning and analysis of the various provisions of the CC&Rs.

The majority correctly examines the text of the disputed provisions in the context of the CC&Rs as a whole. *See Yogman*, 325 Or at 361; *see generally*, *Portland Fire Fighters' Assn. v. City of Portland*, 181 Or App 85, 91, 45 P3d 162, *rev den*, 334 Or 491 (2002) (setting forth Supreme Court's contract-interpretation methodology). As the majority notes, 316 Or App at 654-55, plaintiff's focus is on Article VII, section 1, of the CC&Rs, which provides, in part: "Golf Course. A portion of the real property described in Exhibit A *shall consist of the golf course* and related facilities." (Emphasis added.) Defendants, on the other hand, emphasize Article III, section 4, which states:

> "A portion of the real property described in Exhibit A *may be developed as a golf course and related facilities*. The golf course and related facilities may be modified, expanded, or contracted, *discontinued or converted to other uses*, or sold or transferred by the owner thereof, and the use of the golf course and related facilities may be restricted to private members, all as more fully described in Article VII."

(Emphases added.) For reasons set out in the majority opinion, plaintiff contends that the language of Article VII, section 1, in light of other specific text in the CC&Rs and the document taken as a whole, unambiguously requires defendants to maintain in perpetuity a golf course in some form. Defendants, taking the same approach, contend that Article III, section 4, can only be understood to give the CC&Rs' declarant and its successors discretion to maintain or *not* maintain a golf course.[2] Defendants emphasize the language in Article III, section 4, seemingly authorizing the golf course and related facilities to be "discontinued or converted to other uses," uses defendants contend include further residential development. Neither view, in my opinion, is wholly correct.

---

[2] The CC&Rs appear to contemplate that the declarant will initially develop a golf course, after which it may transfer ownership of the course. Although many of the provisions of the CC&Rs refer to the rights and obligations of the owner of the golf course rather than those of the declarant, for ease of reference this opinion uses the term "declarant" to describe both the initial developer of the Golf Course Estates at Creekside and its associated golf course as well as any subsequent owner of the golf course.

        In adopting defendants' interpretation of the CC&Rs, the majority likewise starts with the text of Article III, section 4. 316 Or App at 656. In so doing, however, the majority quickly reads more into that section—and thus into the CC&Rs as a whole—than that text readily supports. Characterizing that section, the majority opinion concludes that, in providing the declarant the right to modify, expand, contract, discontinue, or convert to other uses the golf course and related facilities, the "CC&Rs in essence gives the declarant/golf course owner plenum power over the real property," including the power to discontinue the golf course. *Id*.

        The problem with that characterization of Article III, section 4, is that it precedes meaningful consideration of the last clause of the section, which expressly qualifies the powers it extends, stating "*all* as more fully described in Article VII." (Emphasis added.) Article VII of the CC&Rs—entitled "THE GOLF COURSE"[3]—sets out in some detail the nature of the declarant's rights and obligations regarding "the golf course." And as plaintiff points out, in addition to providing in its first section that "[a] portion of the real property described in Exhibit A shall consist of the golf course and related facilities[,]" Article VII elaborates in its third section that the declarant's rights with regard to the "related facilities" differ from those it has as to the golf course itself.

        Specifically, Article VII, section 3, gives the declarant the "right *** to modify, expand, contract, eliminate, construct or move the location of *any related facility*[.]" (Emphasis added.) As to the golf course itself, however, section 3 extends fewer rights. Echoing, in part, the declarant's rights as to the related facilities, section 3 authorizes the declarant to "modify, expand or contract the layout of the golf course[.]" Conspicuously absent, however, is any extension of the right to "eliminate" the golf course or its layout. In plaintiff's view, that provision's omission of an explicit right to eliminate the golf course unambiguously reflects the declarant's intent to *prohibit* the removal of the golf course, at least short of an amendment to the CC&Rs by plaintiff's members.

────────────

        [3] Article III of the CC&Rs is entitled "GENERAL DEVELOPMENT PLAN."

The majority opinion acknowledges that Article VII, section 1, provides that a portion of the property "shall consist of the golf course," but it rejects plaintiff's argument as to the significance of that clause. 316 Or App at 654. The majority reasons that, to the extent that plaintiff contends that that text, considered in light of the CC&Rs as a whole, requires the declarant to retain in perpetuity the golf course it chose to develop, that "interpretation * * * is directly contradicted by the only provision that speaks directly to the issue," namely, Article III, section 4. *Id.* at 655 (emphasizing that Article III, section 4, states that a portion of the property "may" be developed as a golf course and related facilities, which, among other things, the declarant may modify, expand, contract, or discontinue). Thus, the majority concludes, Article VII, section 1, must be read together—and consistently—with Article III, section 4's unlimited grant of power over the golf course's existence. *Id.*

I agree that the various parts of the CC&Rs should be read as consistent where possible, but I do not agree with the conclusions that the majority draws from that principle. In rejecting plaintiff's interpretation out of hand, the majority opinion states that subjecting Article III, section 4, to a requirement found in Article VII, section 1, that the declarant maintain the golf course in perpetuity would "eviscerate[] the power reserved to the declarant under Article III, section 4." *Id.* at 656. But that reasoning presupposes that Article III, section 4, can only be read to support defendants' interpretation that the declarant may eliminate the golf course at will.

Respectfully, that approach is not simply reading potentially conflicting provisions as consistent; it is improperly reading one of those provisions completely out of the document. *See id.* (reasoning that "Article VII, section 1, is, simply, a reiteration of the statement in Article III, section 4," regarding the declarant's right to develop a golf course on the property); *see also* ORS 42.230 (instructing courts that, in construing legal documents having "several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all").

Moreover, it curtails the analysis by not fully considering the significance of the cross-reference between Article III and Article VII of the CC&Rs. As the majority expressly recognizes, Article III, section 4, which is part of a broad description of the declarant's general development plans, "states that the authority granted under that section is 'more fully described in Article VII.'" *Id.* at 656. Logically, then, the provisions found in Article VII should not be read as mere reiterations of those found in Article III; they should be read to determine how they "more fully describe[]" those provisions.

As noted, all of Article VII is devoted to the golf course. However, Article VII, section 3, contains the language that can most readily be understood as "more fully describ[ing]" aspects of Article III, section 4. On its own, Article III, section 4, appears to give the declarant broad authority over the golf course and related facilities—the right to modify, expand, contract, discontinue, convert to other uses, sell or transfer them. But as set out above, Article VII, section 3, explicitly lists what powers the declarant has as to the "related facilities," and, in a distinct and only partial repeating of that list, sets out what the declarant may do with the golf course. Giving due regard to that distinct treatment of the two uses of the property—as a golf course or as a related facility—it is, in my view, quite reasonable to understand the CC&Rs as giving the declarant more limited rights to remove the golf course once installed, notwithstanding the seemingly broad grant of authority set out in Article III, section 4.

The majority never entertains that possibility. Rather, it dismisses the provisions of Article VII, section 3, stating that it "relates to the *layout* of the course; it has no bearing on whether the declarant is permitted to convert the golf course to a residential development." 316 Or App at 657 (majority's emphasis). But that is not completely accurate. True, that section is entitled "Rights Regarding Layout of Golf Course and Related Facilities," but its text begins by stating "The Declarant shall have the right to design, layout [*sic*] and *construct* the golf course[.]" (Emphasis added.) So, while that same section later gives the declarant

the right to modify the layout of any golf course it constructs, those provisions presuppose that a golf course has been constructed and, notably, unlike the section's provisions regarding "related facilities," they do not authorize the declarant to eliminate or "deconstruct" a golf course once it has been constructed; rather, they provide that "thereafter," the declarant may modify its layout.

None of this is to suggest that plaintiff's interpretation is the *only* plausible understanding of the CC&Rs. Ultimately, defendants' interpretation may prevail. My point is that, in my view, defendants' interpretation of the CC&Rs is not the only sensible and reasonable interpretation of them. As a result, that document is ambiguous. *See Batzer*, 204 Or App at 313 (a contract that is capable of more than one sensible and reasonable interpretation is ambiguous).

Rather than recognize that plaintiff's interpretation, like defendants', is plausible and that the CC&Rs are therefore ambiguous, the majority opinion upholds the trial court's conclusion that they are unambiguous and, ultimately, its dismissal of plaintiff's claims. I would not uphold that conclusion and would, instead, reverse and remand for the trial court to resolve the ambiguity described above in accordance with *Yogman* before issuing a declaration of the parties' rights under the CC&Rs. Accordingly, I respectfully dissent.